**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RYAN BAUM,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 17 C 7647** |
| ) | |
| **BOEING (CHINA) CO., LTD. and THE** ) | **Judge Rebecca R. Pallmeyer** |
| **BOEING COMPANY,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION AND ORDER**

From May 2015 until 2017, Plaintiff Ryan Baum worked for Defendant Boeing (China) Co.,

Ltd. ("Boeing China") as a Security Advisor in Boeing China's Beijing office. In February 2017,

while Baum was on a business trip within China, an employee of the hotel where he was staying

accused Baum of sexual misconduct. Boeing conducted an internal investigation, found the

allegations substantiated, and terminated Baum's employment. This lawsuit followed. Baum, a

white American, alleges that he was discharged, not because of the sexual misconduct charge,

but rather because of his race or national origin, or in retaliation for an earlier complaint he had

made about discrimination. Specifically, several months before his termination, Baum had filed

an internal complaint alleging that he had been denied a promised promotion and that his

supervisor had told a colleague that Baum had "mental issues." Boeing's investigation did not

substantiate these allegations, and Baum continued working for Boeing China until his termination

the following year.

In this court, Baum challenges the failure to promote him and the discharge decision. His

complaint alleges claims against Boeing China and its parent, The Boeing Company, for race and

national origin discrimination under Title VII of the Civil Rights Act, disability discrimination under

the Americans with Disabilities Act, and retaliation for engaging in activity protected by Title VII.

Defendants Boeing China and The Boeing Company jointly move for summary judgment on all of

Plaintiff's claims [59].  For the reasons stated below, Defendants' motion for summary judgment is granted.

## BACKGROUND

In May 2015 Ryan Baum began working for Boeing China, an indirect subsidiary of The Boeing Company, as a Security Advisor in Beijing, China.  (Defs.' Local Rule 56.1 Statement of Facts ("Defs.' SOF") [61] ¶¶ 2, 4, 9–10; Pl's Local Rule 56.1 Statement of Additional Facts ("Pl.'s SOF") [69] ¶ 1.)  Baum initially reported to Prashant Bakshi, International Security and Fire Protection Manager, who worked out of a Boeing office in Singapore; Bakshi in turn reported to the Director of International Security, Verdonn Simmons, who worked for The Boeing Company in Washington State.  (Defs.' SOF ¶¶ 8, 10–11; *see also* Baum Dep. 21:5–18, Ex. A to Defs.' SOF [61-2].)  Other Security Advisors also reported to Bakshi, including Rick Bell, Doug Song, and Kevin Tan.  (Defs.' SOF ¶¶ 12, 41.)  Bell was a Security Advisor for Australia, Song worked in South Korea, and Tan worked in Singapore.  (*Id.* ¶ 41; Pl.'s SOF ¶¶ 8, 13.)  After Bakshi resigned from his position with Boeing in January 2017, Baum reported directly to Simmons.  (Defs.' SOF ¶ 13.)

During his "onboarding" process in February 2015, Baum sent emails that Beijing Human Resources employees found concerning.  (*Id.* ¶¶ 4, 6.)  Baum experienced a technical issue when accepting the employment offer online and sent an email to his primary contact, Recruiter Specialist Elyn Li, who was attempting to resolve the issue.  (*Id.* ¶ 4.)  Baum's February 20, 2015 email stated as follows:

> I just tried that and it did not work.  Please listen.  If [*sic*] does not matter what I write in the inbox; it always comes up BLANK!!!  That is the problem.  No matter what I write in the box, it is ALWAYS BLANK, even when I look at print preview, it is BLANK, that is the PROBLEM!!!

(*Id.*)  On March 26, 2015, Baum sent Li three more emails within a span of six minutes.  Baum asked Li to call him, writing, "Now call me!!!" then "Now!!!!!!!!!!!!!!!" and finally "?????????? I'm waiting???????????????"  (*Id.* ¶ 5.)  On April 2, 2015, Li forwarded these emails to Jillian Du,

Boeing China Human Resources Generalist, and expressed her concerns about the unprofessional nature of Baum's emails, noting the frequency of the messages and his use of strong punctuation "which seems very impolite." (*Id.* ¶ 6.) Li explained that part of her concern was that Boeing China extended Baum's offer right before the Chinese New Year, a holiday during which "[p]eople don't work," and "don't speak emotionally or angrily to others by email or phone." (*Id.* ¶ 7.) Li believed that Baum, who had lived in China for five years by that point, should have understood the significance of the holiday. (*Id.*)

Du forwarded Baum's emails to Bakshi and Timothy Lynch, the Director of Regional Human Resources in Asia, reiterating Li's concerns about Baum. (*Id.* ¶ 8.) Du expressed concern that Baum seemed to lack cultural awareness despite having lived in China for over five years, specifically regarding the "Holiday schedule and balance of urgency" and "the way to communicate with people via email or phone call." (*Id.*) Du suggested that Lynch and Bakshi consider withdrawing Baum's offer or "monitor the situation closely as part of 30/60/90 days after his on board." (*Id.*) Baum understood, as he testified in his deposition, that Bakshi placed him on three-month local counseling—that is, local to Boeing China—concerning "how to be nice to people, something like that, some—something along the lines of behavior." (*Id.* ¶ 14; Baum Dep. 63:10–16.) According to Baum, Bakshi was not "quite sure what the problem was"; Baum characterized the counseling period as "light-hearted." (Baum Dep. 63:23–64:12.) After 90 days, Baum testified, Bakshi told Plaintiff that he was "off and headquarters will never know about it." (*Id.* 64:10–15.) Baum believes that Du, a Chinese national, recommended rescission of the offer or a probationary period because of his "race and [ ] nationality"—white American—and because his "fluency in Chinese . . . made her angry." (Defs.' SOF ¶ 3, 17.) Baum did not recall having heard Du use language that was derogatory based on race or national origin, however. (Baum Dep. 65:14–66:12, 82:24–83:1.)

Within a couple months of the start of Baum's employment with Boeing China, Du began requesting that Baum use English rather than Chinese in business emails. (Defs.' SOF ¶ 23.) On

July 23, 2015, in response to an email Baum sent in Chinese, Du asked "Ryan, can you please write this in English that can help me to better understand what you are trying to ask?" (*Id.*) Du sent more detailed feedback later that day, stating "it's good that you are learning the Chinese," but noting "our business language is English and the email string will involve the expat/foreigner who may not know Chinese. It'll be good if you can use English in the email communication, this can also help to avoid the confusion." (*Id.* ¶ 24.) On December 8, 2015 Baum sent Du another email in Chinese, which Du forwarded to Lynch and Bakshi expressing her concern that Baum "still continuously use[s] Chinese in the email to communicate the business topic." (*Id.* ¶ 25.) Du requested that Lynch and Bakshi "urge [Baum] to be professional and use the office language instead of Chinese." (*Id.*) Bakshi responded that he would discuss the "communication issue" with Baum and noted that he had given Baum "repeated advise [*sic*] on this." (*Id.*) Baum sent two more emails to Du in December 2015 using Chinese, and both times Du requested that Baum use English when discussing business. (*Id.* ¶¶ 26–27.) In January 31, 2016, Baum sent several business emails in Chinese to Human Resources and Accounting colleagues in the Beijing office that were forwarded to Du. (*Id.* ¶ 28.) Du forwarded the email chain to Lynch and Bakshi, and asked for guidance regarding Baum's continued use of Chinese, nothing that Du and another Boeing China employee were having difficulty understanding what Baum needed from them. (*Id.*; *see also* Jan. 31, 2016 Email from Du to Bakshi, Ex. A-11 to Defs.' SOF [61-11].)

Baum was never formally disciplined for using Chinese in the office; instead, he says, Bakshi "counseled" him "multiple times" about it. (Defs.' SOF ¶¶ 29–30; Baum Dep. 90:6–13.) According to Baum, Bakshi did not directly tell him to speak English in the office, but did communicate that message "in context." (Baum Dep. 86:11–13.) Baum testified that Bakshi told him to "follow the Beijing way"; Bakshi himself reported not "know[ing] the culture there," but suggested that Baum "[f]ind out what they do and just do the normal practice for Boeing China." (*Id.* 85:24–86:4.) Plaintiff acknowledged that Boeing officially conducts business in English worldwide (Pl.'s SOF ¶ 4), but denies that Boeing China's official language is English (*id.*), and

4

denies that Boeing China has a policy requiring employees to speak English in the office. (*Id.* ¶ 21.) Plaintiff pointed out that Du sometimes spoke Chinese with colleagues and that meetings were sometimes conducted in Chinese. (Baum Dep. 89:5–7.) Plaintiff also noted that knowledge of Mandarin was listed as a preferred skill in the description of his position. (Pl.'s SOF ¶ 5.) Plaintiff does not dispute Du's email explanation that Baum's communications in Chinese caused confusion, but believes that Du insisted he use English in business communications because "she wanted [him] fired." (Baum Dep. 87:21.) Plaintiff raised his concerns that Du was discriminating against him on the basis of race with Bakshi, but Bakshi allegedly said that he did not "want to go to EEO [Boeing's internal Equal Employment Opportunity Office]." (*Id.* 82:16–23; Pl.'s SOF ¶ 3.) Baum himself did not file an EEO complaint at that time.

In spring 2016, Baum informed Ian Thomas, Vice President of Boeing China, that he had received a job offer from IBM in China and was considering accepting it. (Defs.' SOF ¶ 33.) Baum had a phone conversation with Verdonn Simmons in May 2016 during which Simmons asked what Boeing could do to retain Baum. (*Id.* ¶ 34.) Baum told Simmons that he was interested in a management position; Simmons replied that no manager positions were available, but that Boeing could promote Baum from his current P4 pay scale. (*Id.*) Baum recalls that Simmons said, "we'll promote you to P5" (Baum Dep. 124:16; Pl.'s SOF ¶ 10), but Simmons in his own deposition denied that he had unilateral authority to promote and denied making any promises to Baum about a promotion. (Simmons Dep. 65:12–66:20, Ex. C to Defs.' SOF [61-20].) In any case, that same day, David Komendat, Boeing's Chief Security Officer (*see* Baum Dep. 248:5–6), emailed Simmons, Thomas, and Marc Allen, Senior Vice President of Boeing International, summarizing separate discussions he had with Thomas and Simmons regarding a potential promotion for Baum. (Defs.' SOF ¶ 35.) Komendat reported that they believed Baum was "doing a very good job," but they "agree that [Baum] is not yet ready for management" due to "some maturity issues that will go away with time and coaching," and a need to "work on aligning his communication messaging." (*Id.*) Komendat further noted that Boeing could, however, move

5

Baum from P4 to P5 "with a salary adjustment," and could "adjust his title for public purposes." (*Id.*) Komendat stated that Simmons had not yet conferred with Bakshi, but they believed Bakshi would support the promotion. (*Id.*)

Bakshi did not, in fact, support promoting Baum. On May 23, 2016, Bakshi emailed Simmons to summarize why he did not "feel" Baum was "ready for this promotion yet." (*Id.* ¶ 36.) Bakshi stated that Baum's "good work on some issues" did not "warrant a promotion" because there were "several areas" where Baum needed to improve, including "better planning, communication, following protocol, processes and better team coordination." (*Id.*) Simmons testified that Bakshi's input was the reason Baum was not promoted. (*Id.* ¶ 37.)

Baum submitted an internal EEO complaint on May 27, 2016 by sending an email with subject line "Confidential Email: Official Allegation" to Allen; Sue Ellen Lindsey, the Vice President of HR International; Mark Patton, Regional Counsel; and Ellen Martin (the parties do not provide her title). (Defs.' SOF ¶ 45; Baum EEO Email, Ex. A-16 to Defs.' SOF [61-12].) In the email, Baum raised four issues. First, under the heading "Disingenuous Behavior," Baum complained that he had not been promoted despite Simmons's alleged promise to do so. (Baum EEO Email at 2.) Second, under the heading "Discrimination," Baum summarized his interactions with Du, including her recommendation that his employment offer be rescinded and her requests that he use English in written communications, and complained that Du did not welcome him during the onboarding process. (*Id.* at 3.) Third, under another "Discrimination" heading, Baum described his attempts to help Boeing fill a Security Advisor position in Singapore. (*Id.*) Baum had forwarded the resume of an American from the US Naval Academy to Bakshi. Bakshi had allegedly, in turn, forwarded the resume to Doug Song and implied that Bakshi could easily replace Song as Security Advisor in South Korea should Song ever leave Boeing, which Baum wrote, Song had indicated he might do. (*Id.*) Bakshi did not interview Baum's proposed candidate, and hired someone else, Kevin Tan, for the Singapore opening. (*Id.*) Baum also noted in his EEO complaint that Bakshi did not initially want to hire Rick Bell, an American veteran, for the position he held as

a Security Advisor in Australia, the implication being that Bakshi discriminated against members of the American military. (*Id.* at 3–4.) Fourth, under the heading "Systematic Problem," Baum described problems related to poor management and leadership and a bias against Americans from local employees. (*Id.* at 4.) In a follow-up email to Martin on June 8, 2016, Baum stated that he had a meeting with Simmons after filing his complaint, during which Baum felt intimidated and believed that he was being retaliated against for voicing his concerns. (*Id.* at 5–6.) In a responsive email, Martin explained that Baum's concerns had been forwarded to the Investigation Review Team, and the Ethics and Business Conduct member of the team would review the matter. (*Id.* at 5.)

Boeing's EEO Office investigated Baum's complaints and issued a final report on August 3, 2016. Boeing Investigator Katie Frisbie initiated the investigation, but Investigator Christopher Katahira completed it. (Defs.' SOF ¶ 46.) Katahira is American and worked for The Boeing Company in Washington State. (Katahira Dep. 6:19–22, 7:20–21, Ex. B to Defs.' SOF [61-13].) The allegations covered in the EEO report differed somewhat from those in Baum's May 2016 email. Katahira investigated Baum's initial allegations that in recommending revocation of Baum's job offer and insisting that he refrain from using Chinese, Du discriminated against him on the basis of his race and national origin, and that Simmons and Bakshi had promised him a promotion that he did not receive. (Aug. 3, 2016 EEO Report at 4, 8, 11, Ex. B-11 to Defs.' SOF.) Katahira also investigated new complaints that Baum submitted to the EEO Office in June 2016. (*Id.* at 1.) Baum alleged that Boeing had failed to notify him that he would need to obtain a work visa prior to his resignation from his previous position, which resulted in three months of unemployment.[1] (*Id.* at 2.) Baum also alleged that Bakshi told Song that Baum was having mental health issues and that Boeing was paying to "fix this issue." (*Id.* at 17.)

---

[1] Plaintiff testified that he was told he could begin work while waiting for his Beijing visa to be approved (Baum Dep. 48:4–11); his offer letter from Boeing China stated, however, that his job offer was "contingent on [him] receiving required work authorization for [his] country of employment." (Offer Letter at 1, Ex. A-5 to Defs.' SOF [61-5].)

Baum had to undergo surgery in November 2015 to remove a tumor. (Defs.' SOF ¶ 18.) Plaintiff testified that he submitted medical documentation to Bakshi disclosing his diagnosis and need for surgery, and asked Bakshi not to share the information. (Pl.'s SOF ¶ 7.) Defendants do not dispute that Bakshi questioned Baum in a general way after his surgery, including by asking: "How are you doing?" "Are you ok?" "How's your head?" and "You recovered from your surgery?" (Defs.' SOF ¶ 19.) Plaintiff testified that Bakshi also spoke with Baum about the cost of the operation and asked, "are you sure Boeing's going to be able to pay for that?" (Pl.'s SOF ¶ 8.) Plaintiff testified that Bakshi continued asking about the surgery and Baum's recovery for months. (Id.) Plaintiff considered these comments "neutral" at the time. (Defs.' SOF ¶ 19.) Then in March 2016, Baum's colleague Song allegedly shared with Baum that Bakshi had said that Baum had "mental health issues," and Song asked if Baum was "alright." (Id. ¶ 20.) Baum testified that no one else commented on his mental health (id. ¶ 21), and the EEO report does not suggest that Bakshi mentioned Plaintiff's health to anyone else. (Aug. 3, 2016 EEO Report at 18.)

The EEO Report named four respondents: Bakshi, who worked in Singapore and is Indian; Du, who worked in Beijing and is Chinese; Lynch, who worked in Singapore and is a white American; and Simmons, who worked in Everett, Washington, in the United States and is a white American. (Id. at 1.) Plaintiff testified that he believed Lynch discriminated against him by allowing Du to discriminate against him. (Pl.'s SOF ¶ 6.) After interviewing Baum, Bakshi, Du, Lynch, Simmons, Li, Song, Bell, and Samara Lau (an International Business Support Manager), and reviewing numerous documents, Katahira concluded that Baum's allegations were not substantiated. (Aug. 3, 2016 EEO Report at 2, 20–21.)

Plaintiff continued working for Boeing China for several months. In February 2017, he attended a business trip in Zhoushan, China with about 30 other Boeing employees. (Defs.' SOF ¶ 48.) On February 16, 2017, Baum returned to his room at the Hilton Hotel and, a hotel intern reported, exposed his genitals to her and forcibly tried to make her touch him. (Id. ¶ 49.) Plaintiff denies the intern's accusation, but does not deny that she reported to the hotel's Floor Supervisor

that he sexually assaulted her. (Pl.'s Resp. to Defs.' SOF [68] ¶ 49; Mar. 10, 2017 EEO Report at 4, Ex. B-33 to Defs.' SOF [63].) On the same day as the alleged assault, Boeing Senior Counsel Thomas Roberts and Eva Keung, a Boeing Human Resources employee, interviewed both the hotel intern and Baum. (Defs.' SOF ¶¶ 50, 52.) Roberts prepared memoranda summarizing the interviews. (*Id.*) Roberts also interviewed Ryan Liang, a manager from the hotel who had heard of the assault from the Floor Supervisor, and reviewed closed-circuit television ("CCTV") footage from the hotel. (*Id.* ¶ 55.)

Boeing assigned Katahira to investigate whether Baum had violated Boeing's workplace policies. (*Id.* ¶ 54.) During his investigation, Katahira reviewed Roberts's memoranda summarizing his interviews with the hotel intern, Baum, and Liang, and summarizing the hotel CCTV footage. (*Id.* ¶ 55.) Katahira personally interviewed Baum, and Baum submitted a signed statement recounting his version of the events. (*Id.* ¶ 56.) Katahira also interviewed Roberts and Keung to learn their impressions from their contemporaneous interviews with those involved (*id.* ¶¶ 57–58), and interviewed Patrick Godsil, a Boeing Business Operations Specialist Manager who was at the hotel on the day of the incident and initiated the investigation that Roberts and Keung continued. (Mar. 10, 2017 EEO Report at 5.) As part of the investigation, Katahira assessed the credibility of Baum and the hotel intern. For this assessment, Katahira relied primarily on the documentation from Roberts and Keung's interviews and Roberts's review of the hotel CCTV footage. (Defs.' SOF ¶ 60.) Katahira ultimately found the hotel employee more credible than Baum. (*Id.* ¶¶ 61–62.)

Katahira concluded that the allegation—that Baum made inappropriate comments and exposed his genitals to a Hilton employee and then made inappropriate physical contact with her—was substantiated, and that Baum's conduct was inconsistent with Boeing's Workplace and Sexual Harassment policy. (Mar. 10, 2017 EEO Report at 3; Defs.' SOF ¶ 63.) Katahira presented a summary of his report and conclusions during a conference call with Timothy Lynch, Lynn Adams (Global Diversity and Inclusion Specialist), Verdonn Simmons, and David Komendat

on March 15, 2017. (Defs.' SOF ¶¶ 64–65; Nuzzi Decl. ¶ 8, Ex. E to Defs.' SOF [61-24].) After hearing from Katahira, Lynch, Adams, Simmons, and Komendat unanimously decided to terminate Baum's employment. (Defs.' SOF ¶ 65; *see also* Katahira Dep. 129:6–10 (denying that he made disciplinary decisions).)

On March 22, 2017, after his discharge, Plaintiff filed a Charge of Discrimination with the EEOC, through counsel. (Defs.' SOF ¶ 68; *see also* EEOC Charge, Ex. A-3 to Defs.' SOF [61-4].) Plaintiff named his employer as "Boeing" and listed an employer address in Beijing, China. (EEOC Charge at 1.) The parties agree that the address he listed was the location in China where Baum worked. (Pl.'s Resp. to Defs.' SOF ¶¶ 2, 69.) Plaintiff checked boxes corresponding to discrimination on the bases of race, national origin, disability, and retaliation. (EEOC Charge at 1.) In the factual summary, Baum explained that he had been harassed, denied a raise, denied promotional opportunities, and discharged due to his race, national origin, perceived disability, and in retaliation for his opposition to discrimination. (*Id.* at 3.) The relevant conduct included Du's request that he not communicate in Chinese, the denial of a promotion he claims to have been promised by Simmons, and Bakshi's false communication to Song that Baum had a mental disability. (*Id.*) Plaintiff also alleged that his discharge was a pretext for retaliation. (*Id.*) Plaintiff named Bakshi and Simmons in the charge for the purpose of identifying his supervisors. (*Id.*) Defendants do not dispute that The Boeing Company received a copy of Baum's EEOC charge through its Director of EEO Compliance, Ozzie Pierce. (Defs.' Resp. to Pl.'s SOF [71] ¶ 37.)

In October 2017, Plaintiff filed a complaint in this court alleging four counts of race, national origin, and disability discrimination, as well as retaliation, against Boeing China and The Boeing Company. Plaintiff alleges that he was denied a promotion and discharged because of his race or national origin, and that he was denied a promotion because Bakshi perceived him to have a disability. Plaintiff also alleges that the given reason for his discharge—a violation of Boeing's workplace policy—is pretext, and that he was in fact discharged in retaliation for his internal EEO report. Defendants move for summary judgment on each of Plaintiff's four claims, arguing that

Plaintiff has provided no evidence of discrimination or retaliation. The Boeing Company separately contends that Baum did not exhaust administrative remedies against it by naming it in his EEOC charge.

## DISCUSSION

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears an initial burden of proving the absence of such a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When the nonmovant bears the ultimate burden of proof at trial on a particular issue, however, the party moving for summary judgment need not "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323 (emphasis in original). Rather, the movant may discharge its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). This requires the nonmovant to "go beyond the pleadings" to demonstrate that there is evidence from which a reasonable jury could find in his favor. *Modrowski*, 712 F.3d at 1168 (quoting *Anderson*, 477 U.S. at 251). When ruling on a motion for summary judgment, a court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255; *but see Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721–22 (7th Cir. 2018) (inferences "supported by only speculation or conjecture" will not suffice).

## I.    Discrimination on the Basis of Race (Count I) and National Origin (Count II)

Baum claims that Defendants discriminated against him by denying him a promotion and terminating his employment because he is a white American. (Pl.'s Resp. [70] at 10.) Title VII

makes it unlawful for employers "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). The primary question in a Title VII discrimination case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The court must assess the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *McDaniel v. Progress Bell Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quoting *Ortiz*, 834 F.3d at 765).

While courts in this Circuit no longer consider whether evidence of discrimination is "direct" or "indirect," *Ortiz*, 834 F.3d at 766, a "plaintiff may utilize the *McDonnell Douglas* 'burden-shifting framework'" to make a showing of unlawful discrimination. *McDaniel*, 940 F.3d at 368 (quoting *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under this approach, the plaintiff must show evidence that '(1) [he] is a member of a protected class,[2] (2) [he] was meeting the defendant's legitimate expectations, (3) [he] suffered an adverse employment action, and (4) similarly situated employees who were not members of [his] protected class were treated more favorably.'" *McDaniel*, 940 F.3d at 368 (quoting *Skiba*, 884 F.3d at 719). "If the plaintiff meets each element of [his] prima facie case, 'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts

---

[2]     Ordinarily in cases of "reverse" discrimination, a plaintiff must produce evidence that "background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (citing *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 678 (7th Cir. 2012), and *Phelan v. City of Chicago*, 347 F.3d 679, 684–85 (7th Cir. 2003)). Neither party invokes this requirement, perhaps because Plaintiff may not have been in the majority at Boeing China's Beijing office. The court assumes that the first element of the *McDonnell Douglas* approach is satisfied because Defendants do not challenge it.

back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *McDaniel*, 940 F.3d at 368 (quoting *Skiba*, 884 F.3d at 719–20). The court must consider all available evidence because the *McDonnell Douglas* framework is "merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action" based on a proscribed factor. *McDaniel*, 940 F.3d at 368 (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)).

Plaintiff discusses his race and national origin discrimination claims in terms of "direct" evidence, the *McDonnell Douglas* framework, and the evidence "as a whole." (Pl.'s Resp. at 6.) As noted, the Seventh Circuit has instructed district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Ortiz*, 834 F.3d at 765. The court will begin its assessment of the evidence by applying the *McDonnell Douglas* framework, and then will consider the evidence cumulatively to determine whether the evidence supports an inference that Defendants failed to promote or discharged Plaintiff because of his race or national origin.

A.    ***McDonnell Douglas* Framework**

1.    **Meeting Boeing's Expectations**

To succeed on his claim that Boeing China terminated his employment due to his race or national origin, Baum must produce evidence showing that he was meeting Boeing's legitimate expectations; for his failure to promote claim, Baum must show that he was qualified for the promotion sought. *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). Whether an employee is meeting expectations or is qualified for a promotion is assessed at the time of the adverse employment action. *See Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). Defendants contend that Baum was not qualified for a promotion because of "his rude and aggressive emails during the onboarding process, his unprofessionalism in continuing to use Chinese in his business communications after repeated counseling, and his confrontational and

entitled attitude in demanding a promotion." (Defs.' MSJ at 13.) Defendants also cite Bakshi's reasons for denying Plaintiff a promotion: that Baum needed to improve in the areas of "planning, communication, following protocol, processes and better team coordination." (Defs.' SOF ¶ 36.)

Baum does not directly challenge the reasons Bakshi gave for finding Baum unprepared for a promotion, instead disputing only that there were "ongoing or pervasive issues" related to his professionalism and courtesy. (Pl.'s Resp. at 9–10.) Baum explains that he was frustrated when he sent the emails to Li[3] because she was allegedly ignoring his telephone calls. (*Id.* at 9.) Baum does not explain, however, how his frustration either excuses the emails or undermines Boeing's characterization of them as unprofessional. That said, the parties' focus on Baum's emails during onboarding, even if aggressive, unprofessional, and disrespectful (Defs.' MSJ at 9), appears misplaced to the court. Baum sent the emails at issue in February and March 2015, more than a year before he was denied a promotion in May 2016. There is no evidence that Boeing's concerns about Plaintiff's aggressive communications extended beyond the initial 90-day monitoring period. Thus, the onboarding emails appear too distant in time from the denial of Baum's promotion to independently support a conclusion that Baum was not qualified. On the other hand, Boeing's concerns about Baum's ongoing use of Chinese in business emails, despite Du's repeated requests that Baum use English, continued at least through January 2016. (*See* Jan. 31, 2016 Email from Du to Bakshi, Ex. A-11 to Defs.' SOF.) On the whole, Baum's emails to Li and Du may not independently support a finding that Baum was not qualified for a promotion, but Bakshi's stated reasons for denying Baum's promotion might have incorporated Li and Du's concerns. (*See* Defs.' SOF ¶ 36.)

More importantly for Plaintiff's failure to promote claim, Baum has produced no other evidence showing that he was qualified for a promotion from pay scale P4 to P5. Baum asserts that Bakshi's reasons were pretextual, but Baum offers no evidence that he was in fact meeting

---

[3] Baum refers to the emails as being sent to Du, but from Baum's testimony, it is clear that he is referring to the onboarding emails that Baum sent to Li. (Pl.'s Resp. at 9–10.)

expectations in the other areas Bakshi identified as needing improvement: planning, following protocol and processes, and team coordination. (*Id.*) Baum testified that he believed himself to be qualified for the promotion (*id.* ¶ 38), but an employee's perception of his own qualifications does not create a genuine issue for trial. *See Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012); *see also Karazanos v. Navistar*, 948 F.2d 332, 337–38 (7th Cir. 1991). In sum, Plaintiff has not raised a genuine issue of fact regarding his qualifications for a promotion.

Boeing does not independently argue that Baum was not meeting Boeing's legitimate expectations at the time of his discharge in March 2017. *Cf. Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017). There is no indication that issues related to Baum's communications continued past January 2016, over a year prior to his termination. In any event, Baum's termination claim essentially alleges that he was disciplined more harshly than similarly situated employees who were not white Americans. *See, e.g., Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) ("Disparate discipline is a theory of liability rooted, as its name conveys, in proving different treatment for discriminatory reasons."). In this context, the crucial question is not whether Baum was meeting Boeing's expectations, but whether Boeing responded to charges of workplace sexual misconduct in a non-discriminatory manner. *See Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2012) (the court must consider whether the "evidence would establish that the defendants extended leniency to similarly situated [non-]white employees who engaged in similar conduct"); *see also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner, . . . the second and fourth prongs of *McDonnell Douglas* merge.").

### 2.    Adverse Employment Action

Defendants opened summary judgment briefing by disputing that Du's interactions with Baum could be considered adverse employment actions. Specifically, after Baum's emails to Li during the onboarding process, Du suggested revocation of Plaintiff's employment offer or

implementation of a probationary period to monitor his professionalism in future communications. During the course of Baum's employment, Du also repeatedly requested that Baum use English rather than Chinese in his business communications. The court doubts that these amount to adverse employment actions because Baum has not shown that they resulted in a "quantitative or qualitative change in the terms or conditions of employment," *Lauth*, 863 F.3d at 717; *see also McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 789 (7th Cir. 2019) (citing *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009)) ("[T]he warning had no impact on her pay or on any terms or conditions of her employment, so it [ ] was not an adverse employment action."); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 n.31 (7th Cir. 2012) (citation omitted) ("[P]lacing an employee on probation, in some cases, may constitute a materially adverse employment action, but we do not believe that is the case here."). The court need not decide this issue, however, because these are not the employment actions Plaintiff here contends were adverse.[4] Plaintiff instead takes aim at the denial of a promotion from pay scale P4 to P5 and his ultimate discharge. (Pl.'s Resp. at 10.) Defendants do not contest that the denial of a promotion or discharge can be adverse employment actions. *See, e.g., Volovsek v. Wis. Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003) ("The failure to promote is an adverse employment action with respect to discrimination and to retaliation claims.").

### 3.    Similarly Situated Employees

Baum's prima facie case of race and national origin discrimination fails under the *McDonnell Douglas* framework because he has not demonstrated that similarly situated non-white or non-American employees were treated more favorably. "Similarly situated employees must be directly comparable to the plaintiff in all material respects." *Formella*, 817 F.3d at 512 (quotation omitted). The purpose of the comparison analysis is to "eliminate other possible explanatory

---

[4]    Because Plaintiff denies that Du's actions independently constitute adverse employment actions, this court need not address Defendants' argument that any claim based on conduct by Du is time-barred. (*See* Defs.' MSJ at 16.) Defendants do not argue that Plaintiff's failure to promote or termination claims are time-barred. (*Id.*; Defs.' MSJ Reply at 13.)

variables" in order to "isolate the critical independent variable—discriminatory animus." *Id.* (quotation omitted). In general, a plaintiff "must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *McDaniel*, 940 F.3d at 369 (citations and internal quotation marks omitted). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff has met his burden on this issue." *Id.* (internal quotation marks omitted).

With regard to the denial of Plaintiff's promotion from pay level P4 to pay level P5, Plaintiff fails to identify any comparators treated more favorably than he was. Plaintiff testified that his colleagues Rick Bell and Douglas Song told him they also expected promotions to P5 at some point. (Defs.' SOF ¶ 39.) Bell is a white American and Song is Korean American with dual citizenship. (*Id.* ¶ 12.) Neither Bell nor Song was promoted to P5. (*Id.* ¶ 40.) Kevin Tan, from Singapore, was also in Plaintiff's organization, but Plaintiff testified that he too was on the P4 pay scale, and was not promoted to P5 while Baum worked at Boeing China. (*Id.* ¶ 42.) Tan did occasionally act as a stand-in manager when Bakshi was out of the office, but Baum acknowledged that the stand-in manager role came with no additional pay. (*Id.*) Plaintiff did not name anyone else within the Boeing China Security organization who was promoted from P4 to P5 during his employment. Accordingly, Baum cannot establish that his employer promoted someone outside of his class who was not better qualified for the position, *see Riley*, 829 F.3d at 892, and his prima facie case for failure to promote because of his race or national origin fails.

With regard to Baum's claim that he was terminated on the basis of his race or national origin, Baum identified one potential comparator: Prashant Bakshi.[5] (Pl.'s Resp. at 11.) Bakshi

---

[5] Defendants note that Plaintiff did not disclose Bakshi as a potential comparator in an answer to Defendants' interrogatory during discovery. (Defs.' Reply [72] at 8.) During discovery, Plaintiff identified only Kevin Tan—an individual who Plaintiff does not discuss as a comparator for his termination claim. (*Id.*)

is Indian and was a member of "the security apparatus at Boeing China." (*Id.*) Plaintiff claims that Bakshi was the subject of multiple EEO complaints, citing Baum's own complaint and one from Song, but unlike Plaintiff was not discharged or even disciplined. (*Id.*) Plaintiff does not provide information regarding the substance of Song's complaint—Katahira's deposition indicates that it may have involved a claim of sexual harassment by a coworker (Katahira Dep. 79:17–21)— so the court will not consider it further.

There are several considerations that limit Bakshi's utility as a potential comparator. First, Bakshi was Plaintiff's direct supervisor until January 2017. *See Poullard v. McDonald*, 829 F.3d 844, 855 (7th Cir. 2016) (explaining that the fact that the proposed comparator was the plaintiff's supervisor "alone makes it difficult to conclude that two employees are similarly situated"). True, Bakshi's direct supervisor was Verdonn Simmons until Bakshi resigned in January 2017, and at the time Baum was discharged in March 2017, Simmons was also his direct supervisor. (Defs.' SOF ¶ 13). But several people were involved in the decision to discharge Plaintiff, and he has not explained whether those same individuals would also have had authority to discipline Bakshi. Second, the EEO investigation did not substantiate Plaintiff's complaints against Bakshi (Aug. 3, 2016 EEO Report at 16, 19), whereas the complaint against Plaintiff was substantiated (Mar. 10, 2017 EEO Report at 3). This means that Bakshi was not comparable to Baum because he was not found to have engaged in any misconduct. Finally, while one of the allegations against Bakshi and the accusation against Baum fell under the same broad workplace policy—Boeing's Workplace and Sexual Harassment Policy[6]—and there is no indication that Bakshi and Baum

---

[6] Plaintiff's EEO allegation that Bakshi lied when he promised Plaintiff a promotion was investigated as a violation of the "Expected Behaviors for all Boeing Employees," which provides that "a Boeing employee is expected to treat others and expected to be treated with respect, dignity, and trust." (Aug. 3, 2016 EEO Report at 16.) Plaintiff's allegation that Bakshi told Song that Baum had "mental issues" was investigated as a violation of Boeing's Workplace and Sexual Harassment Policy providing for a "work environment which is free from harassment when such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating a hostile, intimidating or offensive work environment." (*Id.* at 19.) The EEO report summarizing the investigation of the allegation against Baum explains that the

were otherwise subject to different workplace standards, Bakshi was not alleged to have engaged in similar misconduct as Baum. *See McDaniel*, 940 F.3d at 369. Plaintiff was accused of sexually assaulting an employee of a hotel where he stayed on a business trip. The EEO investigation of Bakshi concerned the denial of Plaintiff's promotion and Bakshi's alleged comments to Song that Plaintiff had mental health issues.

The crux of Plaintiff's argument that Bakshi was similarly situated to Plaintiff but treated more favorably is that Katahira, the individual responsible for conducting both EEO investigations, treated Baum differently than Bakshi. (Pl.'s Resp. at 12.) Plaintiff does not dispute, however, that Katahira had no authority to make disciplinary decisions—in the case of Plaintiff's discharge, Katahira merely relayed the conclusions of his EEO investigation to the individuals responsible for determining an appropriate disciplinary response. (Katahira Dep. 129:1–11, 138:12–16.) In any case, Baum's arguments that Katahira treated Bakshi more favorably at all, let alone due to Baum's race or national origin, are unsupported. Plaintiff raises numerous issues with Katahira's 2016 EEO investigation of Baum's complaint against Bakshi that, in Baum's view, show bias in favor of Bakshi. Thus, Baum notes, Katahira did not prepare a list of questions to ask Simmons prior to interviewing him, Katahira allegedly misstated the date that he received Baum's EEO statement, Katahira reached a conclusion about Baum's cultural awareness and professionalism that Baum believes is unreasonable,[7] Katahira did not contact a former Boeing employee who

---

Harassment Policy "extends to employee conduct that occurs while traveling on Company business." (Mar. 10, 2017 EEO Report at 16.)

[7]    Specifically, Baum challenges Katahira's conclusion that Baum's emails to Li were unprofessional because they occurred during the Chinese New Year holiday "where there is a particular showing of goodwill between employees." (Pl.'s Resp. at 12.) Plaintiff believes that Katahira is not credible because he could not independently recall the date of the Chinese New Year and did not research what an appropriate response would have been. There is no indication, however, that an appropriate response could not have been discerned from Katahira's interviews with Boeing China employees. Moreover, as the court reads Li's email summarizing her concerns, she was wary of judging Baum too harshly because he was of a different cultural background, but would have considered the tone and sequence of Baum's emails inappropriate, regardless of when they were sent. (*See* Apr. 2, 2015 Email from Li to Du, Ex. A-6 to Defs.' SOF

allegedly left because of poor management by Bakshi despite Baum's request that Katahira do so, and Katahira never spoke to Song or Bell despite Baum's request that he do so.[8] (Pl.'s Resp. at 12.)  Plaintiff also claims that the substance of Katahira's investigation into Baum's complaints was flawed because Katahira determined that Du's request that Plaintiff speak English in business communications was reasonable.  (Id. at 13.)  It is not clear to the court, however, how a conclusion about Du indicates more favorable treatment of Bakshi.

In Plaintiff's view, Katahira's investigation of Plaintiff's alleged sexual assault of a hotel worker while on a business trip was heavily biased against him.  (Id. at 14.)  Plaintiff complains that he repeatedly asked what he was being investigated for but was not told for some time.  (Id.)[9] Upon learning of the allegations, Baum asked for the Chinese police to take part in the investigation, but Katahira did not pursue police involvement.  (Id.)  Plaintiff also argues that Katahira did not have enough information to judge the credibility of the hotel intern who accused Baum of sexual assault because Katahira did not investigate alleged timing discrepancies, relied on an interview with Plaintiff's accuser conducted by Roberts, did not look at a picture or video of

---

[61-6].)  The court suspects other employers, regardless of the cultural context, would share that view.

[8]     Katahira's report from this investigation shows that he interviewed Bell and Song during the investigation, (Aug. 3, 2016 EEO Report at 17–18), but evidently only asked them about Plaintiff's disability discrimination claim; Defendants do not dispute that Baum requested that Katahira ask Bell and Song about Bakshi's promise to promote Baum, as well.  (Id.; Defs.' Resp. to Pl.'s SOF ¶ 23.)  Katahira testified that there was no indication that Song or Bell had information relevant to Plaintiff's promotion complaint.  (Katahira Dep. 74:23–75:4.)

[9]     Baum may have been unaware of the reason for the investigation.  Yet Roberts, who conducted the investigation on the date of the incident, noted that sometime during the first 5 to 10 minutes of his interview with Baum, Roberts asked Baum if anything Baum had done "could be interpreted as . . ." and Baum interjected "sexual?" and then answered "no."  (Ex. B-33 at 9.)  But until then, no one had implied that the allegation was sexual in nature.  Baum also apparently repeated 20 to 25 times that he did not hit the intern after initially stating that there was "zero touching."  (Id.)  Roberts' account suggests Baum did have at least some idea what he was being investigated for and provides more context for Katahira's credibility determination.

the intern, and did not investigate the intern's criminal record or whether she had made prior similar assault allegations. (*Id.*)

The crucial weakness of Baum's argument is his failure to connect the adoption of his preferred procedures to the comparator analysis under the *McDonnell Douglas* framework. The issues Baum outlined with Katahira's EEO investigations reflect that Plaintiff was dissatisfied with the procedures Katahira used or that Katahira's investigations were potentially flawed, but Plaintiff provides no corresponding evidence of Bakshi's involvement with the EEO process. Accordingly, Baum's complaints about Katahira's investigation do not establish that Bakshi, who was also investigated for an EEO complaint, was treated more favorably.[10] Plaintiff does not suggest, for example, that Katahira agreed to any particular requests Bakshi may have made concerning the investigation of Bakshi's alleged wrongdoing, or that Katahira otherwise used different procedures in his investigation of Bakshi. *See Kariotis v. Navistar Intern. Transp. Corp.*, 131 F.3d 672, 679 (7th Cir. 1997) ("[W]hatever curious process a company employs to reach its decisions is irrelevant so long as nothing in the record suggests that the process is discriminatory."). In sum, Plaintiff has failed to show that Bakshi was treated more favorably during Katahira's EEO investigation of him.

Plaintiff has identified no Boeing employee who was credibly accused of sexual misconduct in the workplace and who was not subsequently discharged. Indeed, Plaintiff identifies no one else who was even accused of such conduct. *Cf. Hanners*, 674 F.3d at 693. Because Plaintiff has failed to identify a similarly situated employee who was not terminated or who was promoted, Plaintiff has failed to establish a prima facie case of race or national origin discrimination using the *McDonnell Douglas* framework.

---

[10] Plaintiff also raises the issues related to Katahira's investigations to show pretext, discussed below. (Pl.'s Resp. at 15.)

**B.      Evidence as a Whole**

The court will consider whether the evidence as a whole would permit a reasonable factfinder to conclude that Baum's race or national origin motivated the denial of a promotion or his discharge.  *Ortiz*, 834 F.3d at 765.  To make a case of race or national origin discrimination, "a plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination."  *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (citation omitted).  There are three "broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment."  *Id.*  The court will assess Plaintiff's promotion and discharge claims separately.

**1.      Failure to Promote**[11]

As noted, Bakshi's opinion that Baum was not ready for a promotion was the primary reason that Baum ultimately was not promoted from pay scale P4 to P5.  (*See* Defs.' SOF ¶ 37.) Bakshi articulated several justifications for his opinion in a contemporaneous email to Simmons and Komendat; in Bakshi's view, Baum needed to improve in the areas of "planning, communication, following protocol, processes and better team coordination."  (*Id.* ¶ 36; May 23, 2016 Email from Bakshi to Simmons & Komendat, Ex. C-7 to Defs.' SOF [65].)  Baum argues that Bakshi's reasons for denying him a promotion are pretextual, and in support, points to Jillian Du's alleged bias against Americans, and offers his recollection of a conversation he had with Bakshi suggesting that Bakshi too was biased against Americans.  When assessing whether an employer's stated reason for an adverse action is pretextual, the "question is not whether the

---

[11]      Both of Katahira's EEO investigations occurred after Plaintiff was denied a promotion; thus, they are not material to Plaintiff's failure to promote claim.

employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011).

While not naming it, Plaintiff offers something akin to a "cat's paw" theory[12] of liability in invoking Du's alleged bias because it is undisputed that Du had no authority to promote Baum and was not consulted during the decision-making process. Plaintiff believes that Du's recommendation that Lynch and Bakshi rescind Baum's job offer or place him on probation in response to the emails Baum sent to Li during onboarding, and Du's repeated requests that Baum use English in business communications, are evidence of Du's bias against him because he is not Chinese. Defendants claim that Du requested that Baum write in English because some of the recipients of Plaintiff's emails did not speak Chinese, and Plaintiff's emails in Chinese were confusing people. (Defs.' SOF ¶¶ 24, 28.) Plaintiff acknowledges that Boeing's official language for business worldwide is English (Pl.'s SOF ¶ 4), but points out that some meetings at Boeing China were conducted in Chinese and that others at Boeing China spoke Chinese at work, including Du herself. (Pl.'s Resp. at 13; Baum Dep. 89:5–7.) Baum also notes that Boeing China had no written policy stating that Chinese was the only language in which employees were to conduct business (Pl.'s SOF ¶ 21), and that knowledge of Mandarin was listed as a preferred skill in the job description for his position when he applied. (*Id.* ¶ 5.)

Even viewed in the light most favorable to Plaintiff, the evidence does not support an inference that Du differentially enforced an English requirement, insofar as there was one, against Baum. *See Joll*, 953 F.3d at 931 (listing cases explaining that selective enforcement of a company's policy can show pretext). Without evidence related to whether anyone else, American or another nationality, was permitted to use Chinese in work-related correspondence, the court

---

[12] "The classic cat's paw case occurs when an 'unwitting manager or supervisor . . . is persuaded to act based on another's illegal bias." *Morris*, 969 F.3d at 762–63 (quoting *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011)). As with Plaintiff's claims generally, the point is not to fit the facts into a specific "doctrine" or "theory," but to determine whether the evidence as a whole is suggestive of discrimination. *See Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020).

cannot conclude that Baum or non-Chinese employees were targeted by Du for differential treatment. *Cf. Vega v. Chicago Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020). Nothing more than Baum's own speculation supports his suspicion that Du's purported differential enforcement of an English policy was based on Baum's race or national origin, rather than because his communications in Chinese were confusing. Plaintiff testified that he believed Du did not like non-Chinese people to speak the language (Defs.' SOF ¶ 31), but Plaintiff's speculation cannot defeat a motion for summary judgment. *Formella*, 817 F.3d at 513. Nor is there any evidence that Du disparately enforced a policy related to professionalism. Plaintiff has not, for example, identified other employees who sent emails using a tone similar to the one he used with Li and who were not placed on probation. Nor is there other evidence that Du's suggestion that Baum's offer be revoked or that he be placed on probation was motivated by discriminatory animus rather than an honest concern about Baum's professionalism or lack of cultural awareness. (*See* Apr. 3, 2015 Email from Du to Lynch and Bakshi, Ex. A-7 to Defs.' SOF [61-7].) Baum perhaps believes that some of Bakshi's stated reasons for denying Plaintiff a promotion, including communication and following protocol, were influenced by Du's allegedly biased interactions with Baum. But he has not identified evidence supporting an inference that Du was biased against him because of his race or national origin, so her conduct does not support an inference that the denial of Plaintiff's promotion was discriminatory.

Baum also contends that Bakshi's reasons for denying Plaintiff a promotion were not truthful because of Bakshi's own bias against Americans. In his deposition, Baum recounted certain comments Bakshi made at some point that Baum argues show bias against Americans. Plaintiff characterizes Bakshi's statements as a xenophobic refrain akin to "go back to your country," but Baum's testimony is more nuanced in context, and is not the "smoking gun" Plaintiff believes it to be. (Pl.'s Resp. at 8–9.) Plaintiff testified that Bakshi made comments "about American citizens getting a lot of promotions in Boeing" and "non-US citizens having a lack— lacking opportunities." (Baum Dep. 149:3–9.) Specifically, Baum recalled that Bakshi told him in

a meeting something like: "You guys should go back to America. You can get promoted by Boeing. So many opportunities for Americans, but if you're not an American citizen, so many limited opportunities to make a career in the—in this company." (*Id.* 149:11–16.) Bakshi allegedly continued by saying "I would love to go back to Boeing America to get promoted within America, but it's too difficult." (*Id.* 149:18–21.) Viewing this testimony in the light most favorable to Plaintiff, Bakshi's statements support an inference that Bakshi thought American citizens (or perhaps, Boeing employees working at American locations) had more opportunities for advancement than non-Americans or other employees outside the United States. It would take an unsupported inference—that, for example, Bakshi wanted to deny Americans promotions to even the score for Boeing's non-American employees and therefore lied about the reasons to deny Plaintiff a promotion—to equate Bakshi's statements with discriminatory animus.

Finally, Plaintiff has pointed to no evidence suggesting that Bakshi's given reasons to deny the promotion were lies. For example, Plaintiff does not claim that he was given conflicting reasons for the denial of the promotion, *see Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016) ("[E]xplanations must actually be shifting and inconsistent to permit an inference of mendacity"), nor does he point to evidence otherwise indicating that he was qualified for a promotion. As discussed above, the critical question in a Title VII discrimination case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Plaintiff's speculation on this score is not enough to raise a genuine issue for trial. The evidence as a whole, including the fact that no one within Plaintiff's organization was promoted from pay scale P4 to P5 while Plaintiff worked for Boeing China, is insufficient to raise an inference that Plaintiff was denied a promotion because of his race or national origin.

### 2. The Termination of Plaintiff's Employment

With regard to Plaintiff's claim that his race or national origin were motivating factors behind his discharge, Plaintiff has provided even less evidence that Boeing China's stated

reason—the substantiated allegation that Plaintiff sexually assaulted a hotel employee while on a business trip—was pretextual.[13]  The alleged bias of Du and Bakshi are not material to Baum's discharge claim.  *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) ("At a minimum, the person with discriminatory animus must influence the ultimate employment decision enough to be a 'proximate cause' of that action.").  Bakshi left Boeing in January 2017, a month prior to the alleged assault and two months before Plaintiff was discharged.  There is no evidence linking Du to Plaintiff's discharge; there is no indication of her involvement in Boeing's EEO investigation of the sexual assault allegation at all, nor does she appear to have been consulted or otherwise involved in the decision to discharge Baum.  The record does not support an inference that the individuals who made the unanimous decision to discharge Baum—Timothy Lynch, Lynn Adams, Verdonn Simmons, and Dave Komendat—harbored any bias against white Americans.  Indeed, at least Lynch and Simmons were also white Americans.  (*See* Baum Dep. 21:10–11, 28:5–13.)

Similar to his failure to promote claim, Baum advances a theory that Katahira's bias influenced the decision to terminate his employment.  It is undisputed that Katahira's EEO investigation of the sexual assault allegation did influence the decision to discharge Plaintiff, although Katahira did not make a disciplinary recommendation.  *See Vega*, 954 F.3d at 1006 (quotation omitted) ("To win . . . [Plaintiff must] show a causal 'link between an employment decision made by an unbiased individual and the impermissible bias of a non-decisionmaking co-worker.'"); *see also id.* at 1007 (citing *Staub*, 562 U.S. at 422) ("[T]he dispositive question is whether the discriminatory animus of the investigators . . . was a proximate cause of the termination decision.").  Katahira presented the findings of his investigation to the four decisionmakers, immediately after which (and in the same phone call) the four unanimously

---

[13]        In his statement of facts, Plaintiff notes that after he was terminated, Boeing China replaced him with a Chinese national.  (Pl.'s SOF ¶ 35.)  Plaintiff's brief does not connect this fact to his discrimination claims, however.

concluded that Baum should be discharged. There is no evidence that the decisionmakers independently verified Katahira's report prior to discharging Baum. *Cf. Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015) ("If the ultimate decision-maker does determine whether the adverse action is entirely justified apart from the [ ] recommendation, then the subordinate's purported bias might not subject the employer to liability."). For several reasons, however, Plaintiff's theory that Katahira's discriminatory bias infected the discharge decision does not raise a genuine issue for trial.

The Seventh Circuit has "long noted that challenges to the manners in which employees conduct [ ] investigations [of workplace policy violations] are generally misspent," *Marshall v. Ind. Dep't of Corr.*, No. 19-3270, ___ F.3d ___, 2020 WL 5264748, at *3 (7th Cir. 2020), unless a plaintiff can "point to facts suggesting that the company investigated [him] differently" because of a protected characteristic. *Kariotis*, 131 F.3d at 677. Plaintiff identifies no evidence that Katahira—himself American (Katahira Dep. 6:19–22)—was biased against white Americans. As discussed earlier, Plaintiff argues that Katahira treated Bakshi more favorably than Plaintiff during his EEO investigations. But there is no evidence that Bakshi was in fact treated more favorably, much less that such alleged disparate treatment was due to Plaintiff's race or national origin. Nor has Plaintiff explained whether or how Katahira's investigation and its alleged infirmities compare to Boeing's typical EEO investigation process.

As the court understands it, Plaintiff's second argument is that Katahira's EEO report was so shoddy in its methodology that the decisionmakers could not honestly have relied on it when deciding to terminate his employment, so the alleged sexual assault must be pretext for the real reason for his discharge. (Pl.'s Resp. at 15.) But that argument collapses into a disagreement with Katahira's methodology: Baum suggests that a "jury could look at the way in which Katahira conducted his investigation, and conclude that he was less interested in getting to the truth, and more interested in making a case for terminating Baum." (*Id.* at 17.) Again, Baum has not explained why Katahira wanted to make a case for terminating Baum because of his race or

national origin.  True, courts sometimes find an employer's reason for discharge pretextual when that reason is "irrational on its face." *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 516 (7th Cir. 1999).  But such a finding requires more than merely showing that the conclusion of an employer's investigation was wrong.  *See O'Leary*, 657 F.3d at 638.  The longstanding rule is that "the employer only needs to supply an honest reason, not necessarily a reasonable one." *Flores*, 182 F.3d at 516 (explaining that the employer's stated reason for discharging a Hispanic employee— she was the apparent ringleader of an unlawful work stoppage—may have been wrong, but the plaintiff provided no evidence that the reason was false).  On the other hand, "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held." *Id.*

To challenge the honesty of Boeing's reason for Baum's discharge, Baum needed to provide evidence exposing material errors in Katahira's investigation.  *See Vega*, 954 F.3d at 1005.  That is, an employer's failure to verify the accuracy of its stated reason for an adverse employment decision may show "that the belief was incredible, and merely a pretext for discrimination." *Bechold v. IGW Sys., Inc.*, 817 F.2d 1282, 1285 (7th Cir. 1987).  In *Vega*, the plaintiff, a park district employee, provided testimonial and documentary evidence exposing "numerous material errors" in the investigation that led to her termination.  *Vega*, 954 F.3d at 1005 (affirming denial of the defendant's motion for judgment as a matter of law).  For example, the employer based its conclusion that the plaintiff had falsified her time sheets in part on the movement of her usual work vehicle, but the plaintiff demonstrated that she had not driven her usual vehicle on some of the days when she supposedly falsified her time sheets.  *Id.*  In another instance where she was allegedly late to work, the plaintiff was present at her workplace, a park, on time, but entered the building late because she had found a dead body in the park.  *Id.*  Moreover, the plaintiff had provided evidence that her employer lacked interest in her side of the story.  *Id.*  The court found that the jury could find the employer's reason for firing the plaintiff pretextual because "flagrant inaccuracies and inconsistencies in the employer's supposed reason" for an adverse action can be evidence of pretext.  *Id.*

Plaintiff's complaints about Katahira's investigation of the alleged sexual assault have little in common with the concerns raised by the plaintiff in *Vega.* Baum says he had to ask multiple times before being told what the investigation was about; it is not clear, however, how this affects the reasonableness of Katahira's findings. Baum also complains that Katahira failed to act on his request for Chinese police to take part in the investigation (Pl.'s Resp. at 14), but he has not explained what role the police would have played in an internal investigation of a violation of Boeing's workplace policies; this was not a criminal investigation.

Plaintiff also argues that Katahira did not have enough information to judge the credibility of the hotel employee who accused Baum of sexual assault. Specifically, Katahira did not investigate an alleged timing discrepancy,[14] relied on an interview with Plaintiff's accuser that Roberts and Keung conducted, did not look at a picture or video of the hotel employee, and did not investigate the hotel employee's criminal record or whether she had made prior similar assault allegations. (*Id.*) But these are merely additional factors that Katahira could have considered to assess credibility. Katahira determined that the hotel employee was more credible than Baum by relying on the documentation of Roberts's interviews with Baum, the complainant, and hotel management, along with a summary of CCTV footage and Katahira's own interview with Baum. (Mar. 10, 2017 EEO Report at 14–16.) Katahira based his assessment of the complainant on the lack of evidence of a motive to falsify the complaint, her reported demeanor during the interview with Roberts and Keung, the fact that she reported the alleged assault contemporaneously, and the corroboration of her account by other hotel employees. (*Id.*) Katahira determined that Baum was less credible because he misstated the timeframe of the incident even though he was interviewed only hours after it occurred, and because of other comments and inconsistencies in

---

[14] The manager of the hotel recalled that a floor supervisor contacted him about the incident at around 11:30 a.m. but the CCTV footage showed that the intern did not leave Baum's room until 11:45 a.m. (Pl.'s Resp. at 14.) It is not clear to the court why this a 15-minute discrepancy undermines Katahira's entire investigation.

his account. (*Id.* at 15.) Roberts and Keung likewise noted in their records of the interviews with the complainant and Baum that the complainant's account was more credible. (*Id.* at 14–15.)

Importantly, Plaintiff has not explained how his proposed alternative procedures would have affected the outcome of the investigation or why, specifically, Katahira's conclusions that the complainant was more credible, and her accusation substantiated, were plainly unbelievable. That is, without evidentiary support that there were any alleged "flagrant inaccuracies or inconsistencies" in Katahira's investigation or conclusion, Baum's critiques essentially amount to an assertion that Katahira got it wrong. *Cf. Vega*, 954 F.3d at 1005. Because Plaintiff challenges the manner in which Katahira reached his conclusion, rather than showing that the outcome— Plaintiff's termination on the basis that he allegedly sexually assaulted a hotel employee while on a business trip—was irrational on its face, Plaintiff has failed to raise a genuine issue of fact regarding whether Boeing's stated reason for his termination was pretextual. *See Flores*, 182 F.3d at 516 (quotation omitted) ("[A]rguing about the accuracy of the employer's assessment is a distraction . . . because the question is not whether the employer's reasons for a decision are *'right* but whether the employer's description of its reasons is *honest.'*"); *see also Marshall*, 2020 WL 5264748, at *3 ("[T]he ultimate truth of those allegations is immaterial here because Marshall has pointed to no evidence that the DOC is lying about them, only that the DOC is wrong about them. That is not pretext.").

Nor has Plaintiff offered other evidence supporting an inference that Boeing's stated reasons for discharging him were false or that he was, in fact, discharged because of his race or national origin. Baum identifies no other employees accused of similar misconduct who were not discharged. *Cf. Vega*, 954 F.3d at 1005 ("Vega also had evidence that the Park District disciplined Hispanics more harshly than other groups . . . [and] that the Park District's investigation into her alleged falsification of timesheets was far more aggressive than its investigations of non-Hispanic employees accused of similar misconduct."); *see also Boss v. Castro*, 816 F.3d 910, 916–17 (7th Cir. 2016) (explaining that discrimination can be shown through "evidence, whether or not

30

rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment"). Katahira did investigate Bakshi for a violation of the same broad workplace policy, but Bakshi and Baum engaged in vastly different alleged misconduct and, again, Baum has not shown that Katahira's investigation treated Bakshi more favorably.

Baum last notes that Boeing stopped pursuing the renewal of his visa shortly after the start of the investigation, and asserts that his visa was suspended one week after he received notice of the investigation. Baum does not explain who at Boeing decided to suspend his visa, nor whether this was a deviation from standard practice. Deviations from standard procedures or selective enforcement of company policy can establish pretext, but Plaintiff has not provided evidence to support that this occurred in his case. *Cf. Joll*, 953 F.3d at 931. Boeing perhaps may have been too hasty in concluding that it would terminate Baum's employment, but Plaintiff has not provided any evidence to support an inference that the reason was because of his race or national origin rather than a belief, even mistaken, that the sexual assault allegations against him were substantiated. In sum, Plaintiff has not shown that there is a genuine issue of fact for trial on his race or national origin discrimination claims.

## II.      Disability Discrimination (Count III)

Plaintiff claims that Defendants discriminated against him on the basis of a perceived disability. While working for Boeing China, Plaintiff needed surgery to remove a tumor. Plaintiff provided "a doctor's note of some kind, disclosing information about Baum's tumor and the need for surgery" to his direct supervisor at the time, Bakshi. (Pl.'s Resp. at 18–19.) Plaintiff testified that he asked Bakshi not to tell anyone else about his health issues, but he claims (citing what appears to be nothing but hearsay evidence)[15] that Bakshi nonetheless told Song that Baum was having "mental issues" and that Boeing was paying "a lot" to fix them. (Pl.'s SOF ¶ 8.) According to Plaintiff, Bakshi also had an "inexplicable interest in Baum's medical issues," asking about the

---

[15]      Defendants object to consideration of Bakshi's alleged statements on this basis (Defs.' MSJ at 17–18), and Plaintiff did not respond to the argument.

size of the tumor and the cost of the operation, and continuing to ask about Baum's recovery six months after the operation. (Pl.'s Resp. at 19.) Plaintiff's brief connects his perceived disability to Boeing's failure to promote him (*id.*), and there is no evidence that anyone aside from Bakshi and perhaps Song knew about Plaintiff's tumor and surgery. Bakshi resigned from Boeing prior to Plaintiff's discharge and Song was not involved in that decision, so the court need not consider whether disability discrimination played any role in Plaintiff's discharge.

Baum contends that Boeing's failure to promote him violated the ADA, which prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a claim for disparate treatment on the basis of a disability, a plaintiff must show that (1) he is disabled, (2) he was qualified to perform the essential functions of his job with or without a reasonable accommodation, and (3) his disability was the "but for" cause of an adverse employment action. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (citations omitted).

Plaintiff does not address the elements of a prima facie case of disability discrimination, instead arguing that the evidence "as a whole" supports an inference that he was not promoted on the basis of his disability. (Pl.'s Resp. at 18 (citing *Ortiz*, 834 F.3d at 765).) The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C). Plaintiff believes that Bakshi regarded him as having an impairment. Accordingly, Plaintiff must point to evidence supporting that he "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). The ADA clarifies that the "regarded as" prong does not apply to transitory impairments that have an "actual or expected duration of 6 months or less." 42 U.S.C.

32

§ 12102(3)(B).  Plaintiff claims Bakshi knew he had a tumor and required surgery to remove it, but from Plaintiff's own account, his impairment, if any, appears to have been "transitory."

More importantly, Plaintiff has not identified evidence showing that Bakshi declined to promote him on the basis of any impairment he perceived Baum to have as a result of the tumor or surgery.  To "survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action."  *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).  A plaintiff may show that disability discrimination was the "but for" cause of his termination using evidence such as an admission by his employer, or circumstantial evidence including:

> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Id.* (quoting *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 684 (7th Cir. 2014)); *see also Kurtzhals v. Cty. of Dunn*, 969 F.3d 725, 729 (7th Cir. 2020) (citations omitted) (the question to ask is "could a reasonable juror conclude that [plaintiff] would not have suffered the same adverse employment action if he were not disabled and everything else had remained the same?").

Plaintiff has failed to show that a genuine issue of material fact exists regarding whether his tumor was the "but for" reason that he was not promoted from pay scale P4 to P5.  Plaintiff points to evidence that Bakshi asked about Plaintiff's surgery several times over a six-month period, and that Bakshi played a critical role in denying Plaintiff's promotion.  Plaintiff speculates that his perceived mental disability could have motivated Bakshi's decision, but Plaintiff himself characterized Bakshi's comments about his health as "neutral."  (Defs.' SOF ¶ 19.)  There is no evidence that the tumor and related surgery was the reason Bakshi did not want Baum promoted.  As noted, there is no evidence that any Boeing employees not regarded as disabled were promoted from P4 to P5 while he worked for Boeing—indeed, Plaintiff knows of no one at all who was promoted from P4 to P5 during the relevant time.  Nor has Baum identified any connection

between the comments Bakshi made about his tumor and surgery and the reasons Bakshi gave to support his opinion that Baum was not ready for promotion. Because Plaintiff has failed to point to evidence from which a reasonable juror could conclude that he would have been promoted were he not perceived as having an impairment, summary judgment in favor of Defendants on Baum's disability discrimination claim is appropriate. *See Kurtzhals*, 969 F.3d at 729.

### III.   Retaliation (Count IV)

Finally, Plaintiff asserts that Boeing China terminated his employment in retaliation for his complaint of discrimination to the Boeing EEO.[16] To succeed on a claim of retaliatory discharge, a plaintiff must show that "(1) [he] engaged in protected activity, (2) [he] suffered an adverse action, and (3) there was a 'but for' causal connection between the two." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020). As with Plaintiff's other claims, the court considers "the evidence as a whole and conduct[s] a 'straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the materially adverse action?'" *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (quotations and alterations omitted). "In the Title VII retaliation context, causation can be established by circumstantial evidence, which includes, for example, 'suspicious timing, a pretextual explanation for the termination, and evidence that similarly situated employees were treated differently,'" but this list is not exclusive. *Id.* (quoting *Gracia v. SigmaTron Int'l Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016)). Defendants do not dispute that Plaintiff's May 2016 EEO complaint was protected activity nor that his termination was an adverse action. Defendants do, however, challenge the causal element, arguing that Plaintiff was discharged for violating Boeing's Workplace and Sexual Harassment Policy after a Boeing investigation substantiated the allegation by a hotel employee

---

[16] Plaintiff testified that he believed he was denied a promotion because of an "EEO issue," but does not pursue a theory that the denial of a promotion was retaliatory in his briefs. (Pl.'s SOF ¶ 15.) Plaintiff filed his EEO complaint after he was denied a promotion.

that Baum sexually assaulted her while on a business trip, not for filing an EEO complaint in May 2016. (Defs.' MSJ at 21.)

Plaintiff contends that a number of facts support an inference that Boeing employees were biased against those who complain about race discrimination and therefore that Baum's termination was, in fact, retaliation for his earlier EEO complaint. (Pl.'s Resp. at 20.) First, Plaintiff asserts that Bakshi was biased against people who complain about race discrimination. When Plaintiff complained that Du's request for Baum to speak English was "racist," Bakshi allegedly responded that he did not "want to go to EEO." (*Id.*) Inferring from this statement that Bakshi was biased against people who complain of race discrimination requires a stretch—but there is no evidence that Bakshi was at all involved in the decision to discharge Plaintiff, so Bakshi's alleged bias against those who complain of discrimination is immaterial for purposes of Baum's retaliation claim.

Plaintiff next argues that Katahira was openly biased against individuals who file EEO complaints. (*Id.*) Again, Katahira was not an individual with authority to terminate Baum's employment, but his EEO investigation strongly influenced the four individuals who did decide to discharge Baum. The source of Katahira's alleged bias against those who file EEO complaints is as follows: Katahira interviewed Song during his investigation of Plaintiff's EEO complaint, and during this interview Song stated that Bakshi had told Song that Baum had "mental issues." (Aug. 3, 2016 EEO Report at 18.) Katahira also interviewed Bakshi, who denied stating that Baum had mental issues but acknowledged telling Song that Baum might not be able to attend a business trip due to medical issues, which he did not specifically identify. (*Id.*) Katahira found Song's account less credible than Bakshi's because Song had a motive to falsify information; Song had recently filed an EEO complaint of his own against Bakshi that was determined to be unsubstantiated by another investigator. (*Id.* at 19.) Plaintiff believes that Katahira's credibility determination shows that "in [Katahira's] eyes, those who file EEO complaints are inherently not as credible as those being accused." (Pl.'s Resp. at 20.)

This evidence is insufficient to establish that Baum's discharge was a product of retaliation. First, the timing: Baum was terminated in March 2017, nearly ten months after his May 2016 complaint. A ten-month gap between the protected activity and adverse action undermines any inference of causation. *See Kotaska*, 966 F.3d at 632 (over a year too long); *O'Leary*, 657 F.3d at 635 (sixty-day gap was "not strongly suggestive of retaliation, either alone or in [ ] context"). Second, Katahira's isolated determination of Song's credibility in the context of one EEO investigation, without more, does not suggest that he was consistently biased against those who made EEO complaints in a way that would affect the outcomes of subsequent investigations. Again, Katahira made this credibility determination ten months prior to the adverse employment action, and in a separate EEO investigation. *See Bagwe*, 811 F.3d at 885 (quotation omitted) ("Remarks can raise an inference of discrimination when they are (1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action."). Plaintiff identifies no evidence showing that Katahira used the filing of an EEO complaint to assess credibility in any other investigation. And the report summarizing Katahira's investigation of the allegation against Baum makes no mention of Baum's prior EEO complaint, much less as a basis for evaluating Baum's credibility. *Cf. Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) ("[Plaintiff] must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have."); *see also Skiba*, 884 F.3d at 721 (quotation omitted) ("[O]ur favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture.").

There is evidence that, of the individuals who decided to terminate Plaintiff's employment, at least Lynch, Simmons, and Komendat were somewhat involved in Plaintiff's earlier EEO complaint. (*See* Aug. 3, 2016 EEO Report at 20–21.) Their involvement is not sufficient, standing alone, to establish a retaliatory motive. *See Kotaska*, 966 F.3d at 633 (citation omitted) ("A valid retaliation claim requires that the decisionmaker know of the protected activity, but that does not mean one can infer retaliation from the decisionmaker's knowledge alone."). All of the evidence

suggests that Plaintiff was terminated based on substantiated allegations that he violated Boeing's workplace policies. As discussed above, Baum points to no evidentiary support that this reason is pretextual; Plaintiff has not shown that the supposed methodological faults of Katahira's sexual assault investigation made the report's results so facially implausible that the decisionmakers could not reasonably have believed its conclusion to be true. In sum, Plaintiff has failed to point to evidence from which a reasonable jury could conclude that he was discharged in retaliation for his May 2016 complaint of race and national origin discrimination.

## IV.     Failure to Exhaust Administrative Remedies Against The Boeing Company

The Boeing Company independently argues that it should be dismissed as a Defendant because it was not named on Baum's EEOC charge. "Prior to filing suit under Title VII, a party must first file a charge of discrimination with the EEOC, and a party not named as the respondent in the charge may not ordinarily be sued in a private civil action under Title VII." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1089 (7th Cir. 2008)). This requirement also applies to actions brought under the ADA. *Lyons v. Commonwealth Edison*, No. 06 C 4339, 2008 WL 4686153, at *2 (N.D. Ill. May 5, 2008) (citing *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 (1979), and *Pauls v. Elaine Revell, Inc.*, 571 F. Supp. 1018, 1020 (N.D. Ill. 1983)); *see also Massey v. Churchview Supportive Living, Inc.*, No. 17 C 2253, 2018 WL 999900, at *4 (N.D. Ill. Feb. 21, 2018). "Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1851 (2019). The purpose of the requirement is "to notify the charged party of the alleged violation," and to "give[ ] the EEOC an opportunity for conciliation, which effectuates Title VII's primary goal of securing voluntary compliance with its mandates." *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir. 1989). In this case, it is somewhat unclear whether The Boeing Company was named in Baum's EEOC charge given that Baum, through counsel, referred to his employer

simply as "Boeing."  But because the court is dismissing all of Plaintiff's claims on their merits, the court need not reach the exhaustion issue.

## CONCLUSION

Plaintiff has failed to show that there is a genuine issue for trial on his Title VII race or national origin discrimination claims, ADA disability discrimination claim, and Title VII retaliation claim.  Accordingly, Defendants The Boeing Company and Boeing China's motion for summary judgment [59] is granted.

ENTER:

Dated:  September 28, 2020

_____
REBECCA R. PALLMEYER
United States District Judge